BURLINGTON, a joint venture composed of Creason Clayton Construction Company, Inc., and Four–O–One Financial Corp., Plaintiff-Appellee,

v.

ARNOLD CONSTRUCTION COMPANY, INC., Auto-Owners (Mutual) Insurance Company of Lansing, Michigan, Defendants-Appellants,

and

Miller, Wihry & Lee, Inc., a/k/a Miller/Wihry/Lee, Inc., Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Jan. 7, 1987.

Certiorari Denied by Supreme Court March 30, 1987.

Ward Dewitt, Jr., Clark Tidwell, Nashville, for defendants-appellants.

William L. Rosenberg, Peter H. Curry, John A. Day, Nashville, for plaintiff-appellee.

## OPINION

TODD, Presiding Judge.

This is a suit for defective performance of a contract to fill a ravine. The Chancellor awarded the property owner a judgment against the contractor and its surety and dismissed the countersuit of the contractor against the owner and the cross-suit of the contractor against a co-defendant engineer. The contractor and its surety have appealed.

Plaintiff is the owner of a tract of land which contained a ravine which required filling for purposes of development. On August 21, 1981, plaintiff and defendant, Arnold Construction Company, Inc., (hereafter defendant) entered into a contract for filling the ravine. Another defendant, Auto Owners (Mutual) Insurance Company of Lansing, Michigan executed the contract as surety for the defendant. Another defendant, Miller, Wihry and Lee, Inc., (hereafter engineers) were engaged to design and supervise the construction of the development, including excavation and grading. In April, 1982, Geologic Associates, Inc. at the request of plaintiff, inspected the fill and determined that it was defective. The contractor denied that its work was defective, and this suit ensued.

The Chancellor's memorandum contains the following:

The contract provided that the contractor "shall be solely responsible for the means, methods, techniques, sequences and procedures of construction," and that it "shall be responsible to see that the finished work complies accurately with the contract documents." (Exh. 6–Gen.Cond.P. 12, § 6.1)

The contractor guaranteed the work would be of good quality free from faults or defects and would be performed in accordance with the contract documents. (Exh. 6–Gen.Con.P. 20, § 13.1)

The contract also provided:

§ 13.4—Neither observations by engineer nor inspections, tests, or approvals by persons other than contractors shall relieve contractor from his obligation to perform the work in accordance with requirements of the contract documents. and

§ 13.9—If required by engineer prior to approval of final payment, contractor shall promptly, without cost to owner and as specified by engineer, either correct any defective work, whether or not fabricated, installed or completed, or, if the work has been rejected by engineer, remove it from the site and replace it with nondefective work. If contractor does correct such defective work or remove and replace such rejected work within a reasonable time, all as specified in a written notice from engineer, owner may have the deficiency corrected or the rejected work removed and replaced.

. . . .

The work was completed in Spring of 1982. At the completion, the Metro Building Inspectors would not approve the work as building sites.

The engineer on the job employed Geologic Associates, a geotech engineering firm, to evaluate the fill installed by the contractor. Test pits were dug and an inspection made.

Geologic Associates found the fill contained a mixture of large rocks and soil, an excessive amount of organic materials, and was poorly compacted and unsuitable to support a foundation. Construction debris, burned materials, tree limbs, roots and large boulders were found in the fill and top-soil below the fill.

. . . .

The owner could not build on Lot 6, 8 and 9 using conventional foundations because the contractor in blasting over-shot the rock causing a fracture of the underlying earth.

Following the contractors refusal to redo the work, the owner removed the defective fill and redesigned the foundations. The cost of correcting the defec-

tive work less what it should have cost amounts to $145,321.72.

The redesigning of the foundations resulted in a loss of one unit at building four valued at $29,000.00 The owner suffered additional damages of $409.51 to a gas pipe.

. . . .

The owner withheld $10,000.00 from the contract price due the contractor.

## CONCLUSIONS OF LAW

1. The work performed by the contractor was defective.

2. The contractor failed to perform the work in accordance with the plans and specifications.

3. Specifically the contractor violated *Sec. A* —3, 4B, 5D, 5E(b), and I of the contract. (Exh. 6)

4. The proper measure of the damages to the plaintiff is the cost of correcting the defective work.

5. Plaintiff is entitled to recover from the contractor and surety jointly $164,-731.23.

Judgment was entered against the contractor and surety for $164,000, and defendant's countersuit and cross-suit were dismissed.

Appellants' first issue is as follows:

I. In finding that the defendant-contractor breached its contract with the plaintiff-developer, did the chancellor err in refusing to consider evidence of pre-construction geological studies prepared by the plaintiff-developer's expert?

As indicated above, the alleged defects were discovered and reported to plaintiff by Geologic Associates, Inc. in April, 1982. The cross-examination of Ronald W. Spivy, representative of Geologic Associates, the following is recorded:

Q. Mr. Spivy, you addressed your April 6th, 1982 report to Miller, Wihry & Lee, did you not?

. . . .

Q. To the attention of Mr. Walter Davidson, I believe?

A. I believe that is correct.

Q. Now, did you deal with Mr. Davidson as the representative of the owner of Burlington in this case?

A. Yes, sir.

Q. And in your April 6th report, Mr. Spivy, you say, "Pursuant to your request," meaning Mr.. Davidson, "We have completed an investigation of the in-place fill at the project and herewith present the data and our comments and recommendations regarding the suitability of fill. Your attention is called to our earlier geotechnical report dated August 25, 1981." Now, why did you call Mr. Davidson's attention to that?

MR. DAY: Objection, Your Honor, not relevant.

. . . .

THE COURT: Let me see. You go ahead and answer the question, and I will rule on the objection.

. . . .

A. That report contained a recommendation that we made based on our initial investigation that included things that were pertinent to the construction.

Q. Why did you feel like it was necessary in the April 6, 1982 report to make mention of that?

A. In subsequent reporting, we normally try to make reference to a prior report as a foundation for the subsequent report to recreate a link between the reports.

Q. Does that earlier report, that August 25, 1981 report—

THE COURT: I will overrule the objection. I overrule the objection and will allow his answer to stand.

BY MR. TIDWELL:

Q. Are you telling me, Mr. Spivy, that you have to read the August 25, 1982 report in conjunction with the April 6, 1982 report?

. . . .

A. I wouldn't say that it was necessary. It would probably be beneficial.

Q. The next sentence, Mr. Spivy, you say, "That report contained recommendations regarding zoning and placement of engineered fill for the entire site." Is that what it says?

A. Yes, sir.

Q. And the next sentence, "This supplementary investigation was initiated because the site grading was not conducted in accordance with the recommendations presented by the August 25, 1981 report. So you, as I understand it, were making a determination whether or not the fill material that was in place was in accordance with your earlier report; isn't that right?

A. That's right.

Q. You weren't asked to go out there and make a determination of whether or not the fill material fit the adequate capacity or inadequacies of the plans and specifications, were you?

A. At that point in time, we had not, or I had not read the specifications for that job. We were not involved with monitoring the work that had been done. We were asked to examine the fill and determine its suitability for the project, and our initial report had addressed that aspect.

. . . .

Q. Now, in that August 25, 1981 report, you describe the site, do you not?

A. Yes. We give a description of the general surface conditions, and we also give a description of the subsurface conditions based on the procedures that we performed.

Q. In that August 25, 1981 report, you speak of geologic hazards, don't you, on page 6?

A. Yeah, we have a section entitled Geologic Hazards.

Q. And you said in that report, Mr. Spivy, that this site, the Burlington site, is located within a geologic environment which is characterized by infrequent but potentially damaging sink hole development?

MR. DAY: I am going to object to the relevancy, Your Honor. This defendant has not raised as a defense in this case that it was impossible to perform this contract. In fact, it says just the opposite; that they complied with the contract, so, therefore, what difference does it make whether this particular area presented a geologic hazard or not? We are getting way off stream here.

THE COURT: What is the purpose?

MR. TIDWELL: My purpose is, if it please the Court, to show that Geologic Associates went out in April of 1982 and made a determination that their earlier recommendation had not been followed. And I am trying to get into the record what those recommendations were.

THE COURT: What does it matter? Suppose they weren't followed. This case is so simple. I think you are trying to complicate it. It is whether or not your client did, in fact, do what he contracted to do, according to the plans and specifications. There could have been other plans and specifications recommended by this witness. I don't see that it would make any difference. If he recommended—all your client had to do was follow these plans and specifications that he bid on, and what somebody else might have recommended, I don't see that it has any value on this case.

In addition, the witness testified that the August, 1981, report contained the following:

A. "There are many aspects of site preparation for this project that are not routine and will therefore require close monitoring during construction. Of particular importance is the substantial quantity of rock excavation that will be required. Proper zoning, placement and compaction of the various types of fill are essential to the satisfactory long-term performance of building subgrades. The grading will need to be monitored on a full-time basis by a knowledgeable soils technician."

■ It is true that the witness admitted that his inspection in April, 1982, was to determine whether the fill was in accordance with the August, 1981, recommendations. It is also true that, if the gravamen of this suit were failure to conform to the August, 1981, recommendations, there would be no basis for liability because the 1981 recommendations were not made a part of the contract. The admission of the witness as to the content of his previous

recommendations were legitimate impeachment of his opinion as to the overall result of the filling but not as to the facts observed by him in his inspection of the fill.

■ Having examined the August, 1981, report, this Court concludes that if its exclusion by the Chancellor was error, the error was harmless because his conclusions are amply supported by the factual testimony of the witness as to the condition and composition of the fill which did violate the provisions of the contract. That is to say, the conclusion of the witness may be disregarded and the decision of the Chancellor will stand upon the facts discovered by digging holes in the fill.

Appellants' insistence seems to be that the pre-construction report of Geology Associates in some manner or other impeaches the post-construction report by the same concern. The pre-construction report resulted from an analysis of the nature of the geologic formation of the area to be filled, with special emphasis upon the limestone content, development of sinkholes and need for constant supervision of the fill. The post construction report does refer to a failure to observe the warnings in the first report, but it also reports the use of defective fill materials, such as large boulders, top soil and debris, in violation of the contract. This Court agrees with the Chancellor that nothing in the August, 1981, report impeached the April, 1982, report of defects in violation of the contract. Since the suit is not based upon failure to comply with the warnings in the first report, but upon violation of the contract, the exclusion of the first report was not error; but, if error, it was harmless.

Appellants argue that the recommendations in the August, 1981, report (constant surveillance) was not included in the contract specifications. Damages were neither sought nor allowed for failure to follow recommendations of the August, 1981, report omitted from the contract. Recovery was sought and allowed for violation of the specifications which were included in the contract.

Appellants rely upon the following provision of the contract:

"*Inspection:* All grades and materials furnished for grading operations shall be subject to inspection by the Owner and/or Engineer. After establishment of proper grading, the Engineer, Owner, and/or their representative shall inspect the existing grades as to their proper elevation. Compaction tests for all areas of fill will be made by the Inspector, if the area does not meet the specifications, the Contractor shall make every effort to obtain the required density. The Contractor shall bear the cost of retesting those areas that previously failed compaction testing."

■ Apparently, appellants fault the owner for not watching the job more closely and preventing defendant from using faulty material. The above quotation does not obligate the owner to guard the contractor against his own mistakes. The quoted provision does not state that "the owner shall inspect". It states that grades and materials shall be *subject to inspection.* No time for such inspection is fixed except by the words, "after establishment of proper grading". These words are interpreted to mean "when the job is completed". This is exactly when the inspection of material was made by digging pits in the fill to expose the nature of the material used for fill. It would have been more convenient and damages would have been reduced by constant surveilance, but this was not the owner's duty under the contract.

The specifications contain the following provisions:

5. Grading and Backfilling

A. Do all grading to accomplish the intent of the drawings, both rough and finish. . . .

. . . .

D. Areas to be backfilled are to be completely cleared of all rubbish, building materials, etc. Compact all backfill material to prevent settlement. . . .

E. The contractor may, after obtaining approval from the engineer, bury rock spoil in the areas designated by the engineer provided the rock and backfill-

ing operation meet the following requirements:

(a) The fill material shall be evenly and uniformly spread in layers not to exceed thirty (30) inches in thickness and thoroughly rolled with approved compaction equipment.

(b) Rock placed in fill shall measure twenty-four inches (24″) or less across the point of largest dimension.

(c) The top twelve inches (12″) of any rock spoil area shall be dressed with an approved earth material which is free of rock, vegitation or other debris.

(d) The area containing rock spoil must be thoroughly compacted and shall meet the 95% maximum dry density as per A.S.T.M.D. 698.

. . . .

I. Where filling is necessary to complete the grade, the fill used shall be good quality fill taken from approved areas on the site.

. . . .

7. Preparation of Subgrade.

A. See paragraph 5—Grading and Backfilling.

. . . .

C. Fill material shall be evenly and uniformly spread in layers over the entire width and thickness of the embankment section. Each layer shall be thoroughly rolled with approved compaction equipment. . . . Soils which are too wet will be allowed to dry before compaction is attempted.

According to the post-construction inspection and report, the following deficiencies were found:

Test Pits 1–4 and 6: Uneven thickness of layers, numerous rock fragments, some organic material, not properly densified during placement, limestone fragments 6 inches to 6 feet in maximum measurement, roots and tree trunks, ground water present.

Test Pit 5: Similar to above without silty clay and rock fragments.

Test Pit 7: Superficial shot rock (not covered with soil) poorly compacted earth fill, layers 6 ft. and 4.5 feet thick, tree trunk, construction debris, glass bottles, metal cans, ground water present.

The report concludes:

. . . [T]he fill placed at the site is unsuitable for use as a bearing medium for the proposed structures. Because of the nature of the fill and considering its low density, as well as the organic material contained within the fill, it is our opinion that total and differential settlement of the foundations bearing on the fill will be excessive.

. . . [P]ortions of the structure will be on bedrock and other portions on the compressible fill.

It is obvious that defendant undertook to fill a ravine, knowing that structures were to be placed on the fill and knowing that the fill would be eventually inspected and tested for content and density. Ordinary reason and prudence would have directed that the specifications be strictly followed as to clean up of site before fill and, selection and compaction of fill material. As a precaution, the engineer might have been requested to inspect and approve from time to time instead of completing the fill without inspection only to have the defects exposed by final inspection.

Appellants rely upon testimony that the materials and compaction were proper. The plaintiff presented testimony to the contrary.

Findings of fact in this non jury case are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d). The evidence does not preponderate otherwise.

No merit is found in appellants' first issue.

Appellants second issue is as follows: II. Did the chancellor err in dismissing the defendant-contractor's counterclaim against the plaintiff-developer and the cross-claim against the defendant-engineering firm which prepared the plans and specifications on the construction project for the plaintiff-developer when the plans and specifications omitted the pre-construction recommendations of the

geological consultant hired by the plaintiff-developer and the defendant-engineering firm?

It is seen that this issue is predicated upon an alleged breach of duty of the property owner to furnish to the contractor the August, 1982, report and/or an alleged duty of the supervising engineer (Miller, Wihry and Lee, Inc.), to include the substance of the August, 1981, report in the specifications. If the contractor were being held responsible for a failure to take the August, 1981, report into consideration in the manner of performing the contract, there might be merit in this contention. However, as previously pointed out, the judgment under review did not penalize the contractor for failure to provide against the perils mentioned in the 1981 report. The contractor was held liable for failure to do exactly what he agreed in the contract to do, including clearing the fill area of all debris, using fill material free of debris and large stones and debris, grading material in uniform layers, and properly packing each layer.

However negligent the owner or its engineer may have been in preparing the contract or specifications, when signed, they became the contract by which both parties were bound, and the contractor would not be released from his duty to perform what he contracted to do, even though the contract requirements were not the wisest or most complete.

■ Appellants suggest that, "[I]f the prescriptions of Geologic Associates had been followed in the first place, perhaps the fill material would not have been called into question". A contractor who performs shoddy work in violation of the contract is not in position to complain that his shoddy work was not exposed until after completion.

■ No merit is found in the appellants' second issue.

Appellants' third issue is as follows:

III. Did the chancellor err in dismissing the defendant-contractor's counterclaim against the plaintiff-developer when the contract provides for an "Inspector" to perform compaction tests for all areas of the fill and for the defendant contractor to be able to meet the density requirements when the plaintiff-developer failed to provide such an "Inspector"?

■ As already pointed out and discussed, the provision that work was *subject to* inspection during progress does not create a *duty* on the owner to provide such inspections, nor penalize the owner for failure to do so. If a contractor chooses to do shoddy work, he assumes the risk of its discovery at a later time when the cost of correction is greater than if discovered promptly. The contractor had the primary duty to see that the work was performed in accordance with specifications. It is no defense that the owner failed to "catch" the contractor and stop further shoddy work.

The contract provides:

Contractor shall be responsible to see that the finished work complies accurately with the contract documents.

The duty of constant inspection was upon the contractor, and the performance of that duty would have assured a satisfactory end result and avoided this lawsuit.

No merit is found in appellants' third and last issue.

The judgment of the Chancellor is affirmed. Costs of this appeal are taxed against appellants. The cause is remanded for such further proceedings as may be necessary and proper.

Affirmed and remanded.

LEWIS and CANTRELL, JJ., concur.