708 A.2d 1

**BLUMENTHAL KAHN ELECTRIC LIMITED PARTNERSHIP**

**v.**

**BETHLEHEM STEEL CORPORATION.**

**No. 203, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 6, 1998.

Robert R. Bowie, Jr. (Teresa K. LaMaster and Bowie & Jensen, L.L.C., on the brief), Towson, for appellant.

Francis J. Gorman (Gorman & Williams, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., BYRNES, J., and JAMES S. GETTY, Judge (retired), Specially Assigned.

BYRNES, Judge.

This appeal is from a judgment entered against appellant Blumenthal–Kahn Electrical Limited Partnership, in the Circuit Court for Baltimore County, on a contract claim by Bethlehem Steel Corporation. Blumenthal initiated suit, alleging that Bethlehem Steel had breached an electrical services contract between the companies by failing to pay Blumenthal the final balance for services performed. Bethlehem counterclaimed, alleging that Blumenthal was itself in breach by virtue of its defective performance and subsequent refusal to correct its work.

The case was tried by the circuit court, sitting without a jury. The court ruled against Blumenthal on its contract claim and in favor of Bethlehem Steel on its counterclaim. It awarded Bethlehem Steel damages in the sum of $189,345.00. On appeal, Blumenthal presents the following questions for review, which we have rephrased slightly:

I. Was the trial court's factual finding that Blumenthal–Kahn breached its contract with Bethlehem Steel by improperly locating electrical stubouts in sections one through four of a twelve section tunnel project clearly erroneous?

II. Did the trial court err in interpreting the language of the contract between Blumenthal–Kahn and Bethlehem Steel so as not to require Bethlehem Steel to avoid additional losses caused by its failure to inspect or negligent inspection and, thus, mitigate its damages?

Our review of the record reveals that the trial court's factual findings were not clearly erroneous and that there was no error in its interpretation of the contract language. Accordingly, we affirm the judgments entered below.

## FACTS

In 1991, Blumenthal and Bethlehem Steel entered into an electrical services contract in connection with the construction of an underwater tunnel. The Massachusetts State Highway Department had approved the Boston Central Artery Tunnel project to extend the Massachusetts Turnpike from south Boston to an area near Logan Airport, through the Boston Harbor. A large number of contractors formed a joint venture for the project. Morrison, Knudsen, Interboten and White ("MKIW"), a "sponsoring partner" of the joint venture, contracted with Bethlehem Steel to fabricate twelve 300 foot tunnel sections at Bethlehem Steel's Sparrows Point plant. Bethlehem Steel was to build the steel tubes constituting the tunnel sections; install within the tubes a gridwork of reinforcing steel (known as "rebar"), electrical fittings, and mechanical fittings; stabilize the tubes with a small amount of

concrete; and deliver them to Boston by barge. Once in Boston, the tubes would be submerged in the Boston Harbor, joined end to end, and encased in concrete, which would be poured around their interiors and exteriors over form plates.

Blumenthal subcontracted with Bethlehem Steel to install the electrical fittings, including junction boxes, conduit connections, and exit points, called "stubouts," from the junction boxes to the interior tunnel walls. The electrical fittings were to be installed behind the rebar grid. Because the electrical fittings were to be embedded in concrete, the stubouts were needed, and allowed, for installation of lighting systems, traffic control systems, fire alarms, and other electrical workings inside the tunnel. Each tunnel section was to have 54 stubouts. The terms of the contract required, and Massachusetts State regulations dictated, that the stubouts be located at uniform heights throughout the tunnel sections.

Bethlehem Steel agreed to pay Blumenthal $1,411,490.72 for the electrical work it was to perform under the tunnel project subcontract. Blumenthal was to invoice Bethlehem Steel monthly for work performed, with a ten percent retention payable upon completion and acceptance of all work.

In determining the correct stubout locations, Blumenthal referred to drawings that accompanied and were part of the contract. The drawings specified that the stubouts were to be situated two feet above the ceiling height of the tunnel. Blumenthal could not determine the precise stubout locations, however, as the drawings did not specify the tunnel ceiling height. Blumenthal asked Bethlehem Steel for that specification, and Bethlehem Steel in turn made inquiry of MKIW. MKIW informed Bethlehem Steel that the ceiling tunnel height was 9'8" above the horizontal axis. Bethlehem Steel then conveyed this specification to Blumenthal.

Bethlehem Steel constructed the tunnel sections two at a time, in reverse order, beginning with section twelve. Blumenthal completed the electrical work in tunnel sections five through twelve, and, following inspection by employees of Bethlehem Steel at Sparrows Point, those sections were

shipped to Boston. After they were submerged in the Boston Harbor and encased in concrete, MKIW notified Bethlehem Steel that some of the stubouts were incorrectly located. Upon further investigation, MKIW determined that the 9'8" ceiling dimension originally given to Bethlehem Steel, and conveyed to Blumenthal–Kahn, was inaccurate. The proper ceiling dimension actually was 11'8" above the horizontal axis. By the time that this discovery was made, however, Blumenthal had commenced work on tunnel sections one through four. Bethlehem Steel paid Blumenthal–Kahn an additional sum to revise its work in those tunnel sections, so as to conform to the amended ceiling height.

Upon completion of the electrical work for tunnel sections one through four, employees of Bethlehem Steel inspected each tunnel section. Tubes one and four were inspected on May 28, 1993; tubes two and three were inspected on July 30, 1993. The inspections did not reveal any irregularities. Bethlehem Steel transported the sections from Sparrows Point to Boston, by barge. In February, 1994, after those sections had been submerged in the Boston Harbor and encased in concrete, MKIW informed Bethlehem Steel that the stubouts in those sections were not located properly either. In particular, the stubouts were not uniformly located; rather, they appeared at different heights and different locations in the interior walls of the tunnels.

MKIW and the Massachusetts State Highway Department demanded that Bethlehem Steel correct the stubout locations. Bethlehem Steel notified Blumenthal of the problem and demanded that it take action to correct the defect. Blumenthal refused to do so, and notified Bethlehem Steel that it was disclaiming liability for the improperly placed stubouts. Thereafter, Bethlehem Steel informed Blumenthal that it was reserving its right to take action against it, and proceeded to correct the stubout locations in sections one through four itself, at a cost of $277,147.00.

Blumenthal issued a final invoice to Bethlehem Steel for the contract retainage amount of $144,149.07. After Bethlehem

Steel refused to pay, asserting that Blumenthal had breached the contract, Blumenthal filed suit against Bethlehem Steel, in the Circuit Court for Baltimore County, seeking the retainage sum as damages. Bethlehem Steel counterclaimed for the costs it had incurred in relocating the electrical stubouts.[1]

At trial, the parties each called two witnesses and placed numerous documents into evidence. At the close of the evidence, the court found that Blumenthal's performance under the contract had been defective. It awarded Bethlehem Steel $189,345.00 in damages for the costs of repairs necessitated by Blumenthal's defective electrical work. The court credited the $144,149.07 retainage against the damage award, and entered judgment in the amount of $45,196.00 in favor of Bethlehem Steel and against Blumenthal. Blumenthal noted a timely appeal.

Additional facts will be supplied as necessary to our discussion.

## DISCUSSION

### I.

### *Standard of Review*

On review of a case tried without a jury, we will not disturb the factual findings of the trial court unless they are clearly erroneous. Md. Rule 8–131(c); *Urban Site v. Levering,* 340 Md. 223, 229–30, 665 A.2d 1062 (1995); *Spector v. State,* 289 Md. 407, 433, 425 A.2d 197 (1981). We review the case on both the law and the evidence, giving due regard to the opportunity of the lower court to judge the credibility of the

---

1. In Bethlehem Steel's counterclaim, it sought damages from Blumenthal for costs incurred in relocating the stubouts in all of the tunnel sections. The lower court found that, in tunnel sections five through twelve, Blumenthal mislocated the stubouts because it had been given the inaccurate ceiling dimension. On that basis, the court ruled against Bethlehem Steel on the claims pertaining to tunnel sections five through twelve. This appeal relates only to the ruling in favor of Bethlehem Steel on the claims pertaining to tunnel sections one through four.

witnesses. Md. Rule 8–131(c). "On our review we are obligated to consider the evidence produced at trial in a light most favorable to the prevailing party; and if substantial evidence is presented to support the trial court's determination, it is not clearly erroneous and hence will not be disturbed on appeal." *Geo. Bert. Cropper, Inc. v. Wisterco*, 284 Md. 601, 620, 399 A.2d 585 (1979).

## II.

In ruling against Blumenthal and in favor of Bethlehem Steel, the circuit court made the following factual finding:

> I find based on [the] evidence that the credible evidence and the reasonable inference to be drawn therefrom, that the ... stubouts ... were improperly, incorrectly installed and that it was a defect that occurred within one year. And pursuant to paragraph five of the contract was a responsibility of Blumenthal Kahn [sic].

Blumenthal contends that this factual finding was clearly erroneous because there was no direct evidence demonstrating that the stubout locations did not conform to the contract requirements when the tunnel sections were inspected in Baltimore, before they were shipped to Boston. Specifically, Blumenthal argues that the court rested its finding upon three pieces of documentary evidence that were not sufficient to sustain it and were irrelevant: two reports of inspections of the tunnel sections, conducted after they had been submerged in the Boston Harbor and encased in concrete, revealing that the stubout locations deviated from the contract specifications, and an August 11, 1993 letter by Frederick L. Graefe of Blumenthal, in which he conceded that thirty-one of the sixty stubouts in tunnel sections six through twelve were "imprecisely" located. Blumenthal asserts that, in the absence of direct evidence that the stubouts were incorrectly located when the tunnels left Baltimore, the only rational conclusion that the court could have reached was that Blumenthal had located the stubouts correctly, but that the stubouts later

shifted position, either during transit to Boston or when the concrete was poured.

Blumenthal's argument fails to take into account several important aspects of the fact-finding process. First, a factfinder considers evidence together with and in light of the other evidence presented, not in a vacuum. *See Proctor Elec. Co. v. Zink,* 217 Md. 22, 33, 141 A.2d 721 (1958)("It is the [fact-finder's] duty to take into consideration all the evidence, whether circumstantial or otherwise, tending to disprove any statement of fact made by a witness, . . . and thus determine the weight or credibility to be given to such statement."); *Locklear v. State,* 94 Md.App. 39, 45, 614 A.2d 1338 (1992)("The fact finder may accept or reject any evidence presented to it."); 32A C.J.S. *Evidence* § 1320 (1996). In reaching its decision, the fact-finder may rely upon the factual evidence presented as well as the reasonable inferences that may be drawn from the facts. *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970)("An 'inference' is a deduction or conclusion which reason and common sense lead a jury to draw from the facts proved."); *Edwards v. State,* 198 Md. 132, 157–58, 83 A.2d 578 (1951); *Miller & Co. v. Palmer,* 58 Md. 451, 459 (1882). Finally, the fact-finder may rely upon circumstantial as well as direct evidence. *Mangum v. State,* 342 Md. 392, 398–99, 676 A.2d 80 (1996); *Hebron v. State,* 331 Md. 219, 226–27, 627 A.2d 1029 (1993)(quoting *Gilmore v. State,* 263 Md. 268, 292–93, 283 A.2d 371 (1971), *vacated in part, Gilmore v. Maryland,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972)). More important, Blumenthal's argument ignores the other evidence that the court considered and relied upon in making its factual findings.

The court based its findings, in part, upon evidence demonstrating that the incorrect stubout locations were *not* a consequence of causes other than defective workmanship. Larry Snyder, Bethlehem Steel's project manager, was the only witness to address the shipment of the tunnel sections. Mr. Snyder testified that the reports he received about the barge

voyages indicated that they took place "basically without incident." On the basis of that testimony, the court found:

> [T]here is no evidence to support or draw a reasonable inference[ ] that the tube or tubes and that the boxes or stubouts or the conduits or any of the above were damaged while in transit via barge transit.

The court also considered evidence demonstrating that the stubout locations had not been adversely affected when the tunnel sections were encased in concrete. David Thorne, an engineer with Bethlehem Steel, testified that the rebar steel in tunnel sections one through four did not move when the concrete was poured over it and that, for the stubout locations to have been altered by the concrete pour, the rebar would have had to move. Accordingly, the court concluded that the imprecise stubout locations had not resulted from either of the extrinsic circumstances suggested by Blumenthal–Kahn.

Having determined that Blumenthal's exculpatory explanations for the incorrect stubout locations were not supported by the evidence, the court considered the affirmative evidence presented by Bethlehem Steel about Blumenthal's workmanship. That evidence demonstrated that Blumenthal used tie wire to support the conduit stubouts, in violation of the contract specifications and contrary to a written instruction by Bethlehem Steel that use of tie wire for that purpose was unacceptable. In addition, an electrical engineer testified on behalf of Bethlehem Steel that Blumenthal's use of string to measure and locate the stubouts had been substandard; without using a template, Blumenthal could not measure with the accuracy and precision needed to locate the stubouts properly.

██ Blumenthal did not produce any records showing that it had taken dimensional measurements or had performed inspections of the stubout locations in tunnel sections one through four, or, if it had done so, what the measuring and inspections revealed. Blumenthal argues that the court ignored the evidence that it presented that the electrical work conformed to the contract specifications when the tubes left the Baltimore shipyard and evidence that Bethlehem Steel

admitted as such. As a fact-finder, the court was free to accept or reject evidence, based upon its own determinations of credibility of the witnesses. *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991); *Snyder v. State,* 104 Md.App. 533, 549, 657 A.2d 342, *cert. denied,* 340 Md. 216, 665 A.2d 1058 (1995). The court rejected the evidence presented by Blumenthal to show that the stubouts met the contract specifications in Baltimore. Moreover, the court did not find, as Blumenthal suggests, that Bethlehem Steel accepted the electrical work prior to shipment to Boston, irrespective of any defects that existed but were not then known.

■ While Blumenthal is correct that there was no direct evidence that the stubouts in tunnel sections one through four were imprecisely located when they were shipped from Baltimore, its assertion that the absence of direct evidence renders the court's factual finding clearly erroneous is incorrect. The document memorializing the later inspection of the tunnel sections established that the stubouts were in the wrong locations after the concrete pour. That evidence, in combination with the evidence eliminating the transit and concrete pour as the causes of the imprecise stubout locations and the proof that substandard techniques were used to site the stubouts and unsuitable materials were used to affix the stubout conduits, constituted competent circumstantial evidence demonstrating that the incorrect stubout locations in tunnel sections one through four were a product of defective workmanship by Blumenthal. Blumenthal's August, 1993 letter acknowledging fault in mislocating stubouts in other tunnel sections merely affirmed its own recognition that its workmanship could affect the final stubout locations; and that the matter was not one that could only be affected by outside forces. The totality of the circumstantial evidence supported a reasonable inference that Blumenthal's workmanship in locating the stubouts in tunnel sections one through four was defective. That finding was not clearly erroneous, and we will not disturb it.

## II.

### i.

Blumenthal argues next that the court erred in awarding Bethlehem Steel the amount of damages that it did. Blumenthal maintains that Bethlehem Steel was negligent in failing to detect that the stubouts were located improperly, during its inspection of the electrical work performed by Blumenthal; that the "negligent inspection" performed by Bethlehem Steel substantially increased the cost of repairing the mislocated stubouts; that Bethlehem Steel had a duty to mitigate damages that were incurred due to its own wrongdoing; and that, because it failed to do so, any damages that it was awarded should have been limited to the costs that would have been expended to repair the stubout location defect had Bethlehem Steel discovered the defect upon inspection, in Baltimore, before the tubes were submerged in the Boston Harbor and encased in concrete. Blumenthal contends that the court committed an error of law when it interpreted a certain provision of the parties' contract to produce a contrary result.

Paragraph five of the contract between Bethlehem Steel and Blumenthal provides, in pertinent part:

QUALITY OF WORK AND MATERIALS:—All work performed and materials furnished by [Blumenthal] hereunder shall be of the kind and quality described in said plans and said specifications and the provisions hereof and shall be first class throughout. **All work and materials shall be subject at all times to the inspection and approval of [Bethlehem Steel's] Engineer. Full opportunity shall be given to [Bethlehem Steel's] Engineer to make such inspections as he may desire upon the Site and in the case of materials manufactured by or for [Blumenthal] at the works of the manufacturer thereof.** The decision of [Bethlehem Steel's] Engineer that any work or materials are not of the proper quality or do not comply with said plans and said specifications and the provisions hereof shall be final and conclusive upon [Blumenthal], and [Blumenthal] shall promptly remove the same and replace them at its own

expense with work or materials of the proper quality, or correct such defects in such other manner as [Bethlehem Steel's] Engineer may direct. **No failure on the part of [Bethlehem Steel's] Engineer to inspect any work or materials at any time or to reject the same shall be deemed an acceptance of any defective work or materials, nor shall it prevent subsequent inspection or rejection thereof. In the event that any defects appear in the Work within one (1) year after the date of final completion and acceptance, which defects in the opinion of [Bethlehem Steel's] Engineer are due to or caused by defective work or materials or by the failure of [Blumenthal] to perform the Work in accordance with said plans and said specifications and with the provisions hereof, [Blumenthal] at its own expense will replace the same with work or materials of the proper quality or otherwise remedy such defects as [Bethlehem Steel's] Engineer may direct.**

(emphasis supplied). The trial court considered paragraph five and stated:

I find that the acceptance at Sparrows Point by Bethlehem Steel or the inspection to whatever extent that it is, and I understand the parties don't agree on the extent, but to whatever extent, whichever theory I would accept, is not controlling because of paragraph five in the contract ..., that if there was a defect caused by Blumenthal Kahn, then, in fact ... they would be responsible for the repair.

The court commented further:

Now, the one other issue that I brought up in debate was the issue, and I don't know how I would have resolved this, but based on my examination of the exhibits and the evidence, I don't need to resolve it.

But if I didn't find what I find, I am not sure how—what would have resolved it. But what I'm talking about, last discussion when we broke, when some of it was academic and some of it not, concerning mitigation of damages I guess I will title it and the fact that concrete was poured

and created a worse problem than existed prior to the pouring of concrete ... Maybe if Beth Steel had done their part, maybe damages would have been less.

\* \* \* \*

And the results that I find are that Blumenthal Kahn then could have rechecked their own work, but they felt their word, in fact, correct, relayed that information to Bethlehem Steel, because Blumenthal Kahn knew the problem same as Beth Steel knew about the problem, but that Bethlehem Steel had a reasonable right to rely on that assertion and the responsibility would not have been on them to check the work pursuant to the contract.

## ii

We observe, preliminarily, that Blumenthal's reference to the doctrine of "mitigation of damages" or "avoidable consequences" is a misnomer. Those related doctrines may apply to breach of contract claims, but not in circumstances such as this. In *Sergeant Co. v. Pickett*, 285 Md. 186, 204, 401 A.2d 651 (1979), the Court held that the trial court erred in not instructing the jury in a contract case about the doctrine of avoidable consequences. The instruction that had been requested properly stated the law as follows:

'Where one party to a contract commits a breach of contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss he sustains as a result of the breach, and he can charge the party in default with such damages only as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.'

*Id.* at 203, 401 A.2d 651. The Court held that the instruction had been properly requested because "there was evidence before the jury which tended to show that [the plaintiff] had not made all reasonable efforts to minimize the loss he sustained as a result of a breach of the contract." *Id.* at 204, 401 A.2d 651.

In *Sergeant,* the plaintiff knew about the loss that the defendant asserted he should have taken steps to mitigate. It is axiomatic that, before the doctrine of mitigation of damages or avoidable consequences will operate to impose a duty upon a plaintiff to minimize a loss that he has incurred by virtue of the defendant's breach of contract, the plaintiff must be aware that he has sustained a loss; to require a plaintiff to mitigate damages that he does not know he has suffered would be patently unreasonable. In this case, there was no evidence that Bethlehem Steel knew that the stubouts had been placed incorrectly. Rather, Blumenthal contends that, because Bethlehem Steel **could have known,** by a more thorough inspection on its part, that Blumenthal's performance was defective, the doctrine of mitigation of damages/avoidable consequences applied. That is not sufficient evidence of knowledge. Bethlehem Steel was not required to take reasonable efforts to minimize a loss about which it was not yet aware.

Blumenthal's damages argument does not raise true issues of mitigation or avoidable consequences; rather, the gist of its argument is waiver or excuse of defective performance. Blumenthal contends that, under the plain language of the contract, Bethlehem Steel either waived or excused Blumenthal's defective performance, by conducting an inspection of the work that could have revealed the defects, if properly undertaken; and that, to the extent that repair costs incurred by Bethlehem Steel flowed from defects that were waived or excused by Bethlehem Steel, they should not be assessed against Blumenthal. We disagree.

Under the objective law of contracts, which is followed in Maryland,

[a] court construing an agreement ... must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the

parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985) (citation omitted); *see also Aetna Casualty & Surety Co. v. Ins. Comm'r*, 293 Md. 409, 420, 445 A.2d 14 (1982). In this case, the plain language of paragraph five controls, as neither party contends that the language is ambiguous.

In *Burlington v. Arnold Const. Co.*, 727 S.W.2d 241 (Tenn. Ct.App.1987), an intermediate appellate court in Tennessee considered the meaning of a contract clause similar to the one at issue in this case. There, a contractor entered into an agreement with a property owner to fill in a ravine on the owner's land. The contract provided:

> *Inspection:* All grades and materials furnished for grading operations shall be subject to inspection by the [property] Owner and/or Engineer. After establishment of proper grading, the Engineer, Owner, and/or their representative shall inspect the existing grades as to their proper elevation. Compaction tests for all areas of fill will be made by the Inspector, if the area does not meet the specifications, the Contractor shall make every effort to obtain the required density. The Contractor shall bear the cost of retesting those areas that previously failed compaction testing.

*Id.* at 245. The contractor's work was substandard, in part because it used faulty materials for filling and grading. On appeal from an adverse judgment in a contract action, the contractor argued that the language quoted above gave rise to a duty on the property owner's part to inspect the contractor's work and that, had the owner inspected the work properly, it would have determined for itself that the material that the contractor used to fill the ravine was not adequate for the job. The court rejected that argument, stating:

The [quoted contract language] does not obligate the owner to guard the contractor against his own mistakes. The quoted provision does not state that 'the owner shall inspect.' It states that grades and materials shall be *subject to inspection.*

\* \* \*

... [T]he provision that work was *subject to* inspection during progress does not create a *duty* on the owner to provide such inspections, nor penalize the owner for failure to do so. If a contractor chooses to do shoddy work, he assumes the risk of its discovery at a later time when the cost of correction is greater than if discovered promptly. The contractor had the primary duty to see that the work was performed in accordance with specifications. It is no defense that the owner failed to 'catch' the contractor and stop further shoddy work.

727 S.W.2d at 245 and 247 (emphasis in original).

■ We agree with the court's reasoning in *Burlington,* which is similar to the analysis applied by the lower court in this case. The wording of paragraph five of the contract in the case *sub judice* did not obligate Bethlehem Steel to perform inspections of Blumenthal's electrical work; the phrase "[a]ll work and material shall be subject at all times to the inspection and approval of [Bethlehem Steel]" means that Bethlehem Steel was entitled to conduct inspections, if it chose to do so. Given that the language did not impose a duty to inspect at all, it certainly did not impose a duty to perform an inspection *so thorough as to reveal all defects in Blumenthal's work.* Indeed, the plain language of the contract was to the contrary: Blumenthal was obligated to ensure that its work was performed in accordance with the contract specifications. By including a contract clause giving it the right to inspect Blumenthal's work, Bethlehem Steel bargained for and received a measure of protection; however, in so doing, it did not relieve Blumenthal of its primary obligation to perform the work correctly nor did it excuse defects in performance that it failed to discover or waive remedies for defective

performance that it was entitled to pursue. The language of the contract is clear: "No failure on the part of [Bethlehem Steel's] Engineer to inspect any work or materials at any time or to reject the same shall be deemed an acceptance of any defective work or materials, nor shall it prevent subsequent inspection or rejection thereof."

Finally, Blumenthal contends that the lower court erred in its interpretation of the language in paragraph five that required Blumenthal to replace, at its own expense, defective work "[i]n the event that any defects appear in the Work within one (1) year after the date of final completion and acceptance...." Blumenthal maintains that this language limited its duty to correct defects in its electrical work to those defects that "appear" within one year, thereby relieving it of any obligation to correct defects that were present when the work was accepted, but were overlooked.

The trial court properly refused to adopt the strained and narrow interpretation of the contract language urged by Blumenthal. Words in a contract must be construed in context. *King v. Bankerd,* 303 Md. 98, 106, 492 A.2d 608 (1985); *Maguire v. State,* 192 Md. 615, 623, 65 A.2d 299 (1949); *P.V. Properties, Inc. v. Rock Creek Village,* 77 Md.App. 77, 83–84, 549 A.2d 403 (1988). The plain meaning of the word "appear" in paragraph five, when read in light of the surrounding language, is to become known; *i.e.,* a defect that "appears" within one year is a defect that becomes known within one year after the date of completion and acceptance, irrespective of when the defect occurred. The incorrect and imprecise siting of the stubouts in tunnel sections one through four became known when those sections were submerged in concrete and inspected, in Boston, within one year of completion and acceptance of the work. The trial court correctly ruled that, under the plain meaning of paragraph five of the contract, Blumenthal was obligated to remedy those defects at its own expense.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**