THE SERGEANT COMPANY ET AL. *v.* RONALD W. PICKETT

[No. 122, September Term, 1978.]

*Decided May 25, 1979.*

*Motion for reconsideration filed June 4, 1979; denied June 5, 1979.*

The cause was argued before SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*James R. Eyler* for appellants.

*Thomas B. Yewell* for appellee.

ORTH, J., delivered the opinion of the Court.

This appeal stems from an action for breach of contract brought in the Circuit Court for Charles County by Ronald W. Pickett against The Sergeant Company and Fidelity

Federal Savings & Loan Association, formerly Waldorf Federal Savings & Loan Association (Sergeant). The background of the case was set out in *Sergeant Co. v. Pickett,* 283 Md. 284, 388 A. 2d 543 (1978).

In his declaration, Pickett, a builder of residential dwellings, alleged that on payment of a valid consideration, Sergeant, acting on its own behalf and as agent for Fidelity, had procured for him a commitment for a permanent mortgage loan which he had accepted. Pickett further alleged that despite this binding obligation, Fidelity and Sergeant had breached the agreement by utilizing the funds earmarked for the Pickett account to make a loan to another borrower. As a consequence, Pickett allegedly incurred various items of damage, consisting primarily of profits lost from expected house sales.

Sergeant responded with a counterclaim, seeking payment for the unpaid portion of the monies which it claimed to be owed for obtaining the loan commitment. The counterclaim alleged that Sergeant had fully performed its bargain by obtaining the commitment, thus entitling it to fees and commissions upon Pickett's acceptance of the loan. Ultimately a jury awarded Pickett a judgment of $53,450 against appellees and also found in his favor on the counterclaim.

At the conclusion of the trial, appellants submitted an assortment of jury prayers to the court, among them their requested instruction No. 10:

> "Where one party to a contract commits a breach of contract, the other party is required by the 'avoidable consequences' rule of damages to make all reasonable efforts to minimize the loss he sustains as a result of the breach, and he can charge the party in default with such damages only as, with reasonable endeavors and expense and

 without risk of additional substantial loss or injury, he could not prevent. M & R Contractors & Builders, Inc. v. Michael, 1958 138 A. 2d 350, 215 Md. 340."

This was not read by the trial court during the course of its ensuing charge to the jury, nor was the principle of law adverted to in the prayer otherwise included in its instructions.

\* \* \*

Without reaching the contention that the trial court had erred in failing to grant the disputed prayer, the Court of Special Appeals held that the point had not been properly preserved for appellate review under sections d and e of Rule 554, "because appellants [had] not distinctly state[d] the grounds of their objection, designating the particular portion of the instructions given, or omitted, or objected to before the jury retired." [*Id.* at 285-287.]

The Court of Special Appeals affirmed the judgment of the trial court. *Sergeant Co. v. Pickett,* No. 452, September Term, 1977, decided 27 December 1977, unreported. We granted Sergeant's petition for the issuance of a writ of certiorari. We did not agree with the intermediate appellate court and reversed its judgment. We believed, for the reasons stated in the opinion, that there had been "[a]t a minimum ... substantial compliance with Rule 554 d and e," which "was therefore sufficient to preserve the issue for appellate review." *Sergeant Co. v. Pickett,* 283 Md. at 290. We concluded our opinion by stating:

Because our grant of certiorari in this case was limited to the question whether failure to give the requested instruction was properly preserved for appellate review, and since the substantive issue arising from the trial court's refusal was fully presented to the Court of Special Appeals, we shall remand the case to that court for appropriate resolution. *Id.*

On remand, in an unreported opinion filed 8 November 1978, the Court of Special Appeals once more affirmed the judgment of the trial court. It still declined to resolve the substantive issue, observing that "[a]lthough our inclination not to address the merits of the complaint has not changed, our reason therefor has." It thought that an " 'appropriate resolution' of the revitalized issue" was properly to be attained under Maryland Rule 1031 c 5 which requires that the brief of the appellant contain "[a]rgument in support of the position of the appellant." It believed that Sergeant's brief did not contain the argument called for by the Rule and, accordingly, it held that the issue had been waived. Sergeant sought review of this judgment by way of certiorari, and we granted its petition. We again reverse.

The Court of Special Appeals set the case down for reargument on remand. When counsel for the parties were informed by the clerk of the court of the date the appeal was to be reheard, they were told:

> Counsel will be permitted to use briefs hereinbefore filed in the original cause for this presentation. The issue in this matter will be relegated to questions 2 and 3 in the appellants' brief.

Pickett's counsel sought clarification from the court; he did not believe that the matter was "presently in a proper posture in the Court of Special Appeals":

> As the Court of Appeals pointed out in its Opinion, the only question raised on certiorari was the adequacy of an exception to the trial judge's refusal to grant a requested instruction concerning mitigation of damages.
>
> Then, as I read the concluding paragraph of the Court of Appeals' Opinion, the matter has been sent back to the Court of Special Appeals to decide, even though the instruction was not given, whether the failure to give the instruction caused any damage to the appellant which would justify a remand to the trial court.

He expressed his fears:

> This case has gone on for quite some time now and
> I'm concerned that if the Court of Special Appeals
> doesn't do exactly what the Court of Appeals says
> it should do, we're going to wind up back in the Court
> of Appeals.

The Court of Special Appeals confessed that the problem as to what the Court of Appeals expected it to decide on remand had been caused by the Court of Special Appeals "having advised the Clerk's Office to limit reargument to 'questions 2 and 3 as they appear in the brief of appellant.' " It informed all counsel that "[t]he correct instruction should have been to limit argument to question 3 as it appears in the brief of the appellants. . . . The other issues have all been decided by our adoption of the trial court's opinion."

The second question presented by Sergeant in its brief was: "Is there legally sufficient evidence to sustain the award of damages?" The third question was: "Did the court err in its instructions to the jury with respect to the law of damages?" Sergeant dealt with these two questions together. It argued that the evidence did not "measure up to the doctrine of reasonable forseeability" as set out in our decisions. It then asserted:

> A primary reason for the unforseeable character
> of Pickett's alleged damages is that the losses could
> easily have been avoided. As noted above, the
> nonavailability of the special forward money did not
> prevent Pickett from proceeding with his plans.
> Instead, Pickett chose to make his profit through
> legal action against Sergeant Company and Fidelity
> Federal. The failure to mitigate damages bars
> recovery by Pickett.

Sergeant then quoted what we said in *M & R Builders v. Michael,* 215 Md. 340, 138 A. 2d 350 (1958), was the ordinary rule with respect to minimization of damages, namely that

> "damages are not recoverable if the consequences
> [of a breach are avoidable. In other words, a

plaintiff] is not entitled to a judgment for damages for a loss that he could have avoided by a reasonable effort without risk of additional loss or injury. 215 Md. 340, 354-355." [1]

Sergeant noted: "This doctrine applies with full force to the instant case. See *Furstenburg v. Fawsett,* 61 Md. 184 (1884)." Sergeant summed up its argument on both questions 2 and 3 thus:

> For all of the reasons stated above, there is legally insufficient evidence to support this jury award of damages and the Court erred in its failure to instruct the jury that it could not award any damages for lost profits. Additionally, the Court erred in its failure to instruct the jury that Pickett had a duty to mitigate damages. These instructions were requested, refused, and exception was taken.

The Court of Special Appeals deemed that the last two sentences comprised the "entire reference to the instructional error argument." It dismissed the prior discussion regarding mitigation of damages as "directed at bolstering [Sergeant's] contention that the case should never have been submitted to a jury," and as not helping the court "to decide whether the trial judge was justified in denying [Sergeant's] requested instruction on mitigation when it was submitted." We do not agree with that narrow view. In the circumstances, we see no such violation of Rule 1031 c 5 as would justify a conclusion that the substantive issue had been waived and should not be considered. Our assertion, whether right or wrong, that the issue had been fully presented to the Court of Special Appeals, stood as the law of the case and called for resolution of the issue on the merits. The setting of the case for reargument, the specific authorization by the Court of Special Appeals to use the briefs previously filed in the court in the original case, the concern of Pickett's counsel regarding the posture of the case on remand and the clarification by the

---

1. The quote in Sergeant's brief leaves out the bracketed words, probably through typographical error.

court sent to all counsel, not only gave no indication that the court thought there was a violation of Rule 1031 c 5, but, on the contrary, led to the reasonable assumption, shared, as was made apparent in oral argument before us, by counsel for all parties, that the issue would be resolved on the merits. There was, of course, no opportunity for the parties to brief and argue the point on which the appeal was decided. The Court of Special Appeals was wrong in the first instance in failing to address the issue on the ground that it had not been preserved below. Because it did not proceed according to the tenor and directions of our mandate, it was also wrong on remand in failing to address the issue on the merits. Maryland Rule 876 d.

In the usual course of events, we would remand the case a second time to the Court of Special Appeals and again direct that it determine the substantive issue as it should have done when the appeal was before it in the first instance. But, considering the circumstances and the tortuous history of what began as a simple appeal, fundamental fairness to the litigants and the interest of judicial administration and economy dictate that the matter be resolved without further ado. The issue for decision is whether the trial court erred in refusing to grant the prayer concerning mitigation of damages. We shall decide it now.

The court may instruct the jury upon the law, either by granting requested instructions or by giving instructions of its own on particular issues or on the action as a whole, or by several or all of these methods, but need not grant any requested instruction if the matter is fairly covered by instructions actually given. Maryland Rule 554 a and b. The court told the jury with respect to damages:

> If you find for the plaintiff, it would be necessary that you determine what damages he would be entitled to recover for a breach of the contract, and the Court tells you that the damages which a party to a contract is entitled to, because of a breach, are those which were reasonably forseeable and within the contemplation of the parties at the time they made the contract.

Damages is limited to such damages as arise out of the contract on which the action is founded, and a recovery cannot be for damages for losses resulting out of collateral contracts or transactions affected by the breach of the contract or transaction affected by the contract, although they may have been entered into on the date of the original contract.

Those that are recoverable must be actual damages which the party has convinced you that he suffered.

They cannot be speculative, remote or uncertain.

The requested prayer was not fairly covered by instructions actually given. We said in *Schaefer v. Publix Parking,* 226 Md. 150, 172 A. 2d 508 (1961):

There can be little doubt that all parties to a law suit are entitled to have the jury properly instructed upon their theories of the case. . . . But this statement presupposes that evidence has been adduced to support the theory of any particular party. The trial courts, in presenting their instructions to the juries, are not required to give the juries merely abstract statements of the law that have no relation to the facts of the case being tried. [*Id.* at 152-153.]

That is: "A litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it." *Levine v. Rendler,* 272 Md. 1, 13, 320 A. 2d 258 (1974); *Fowler v. Benton,* 245 Md. 540, 548-549, 226 A. 2d 556, *cert. denied,* 389 U. S. 851 (1967); *Dorough v. Lockman,* 224 Md. 168, 171, 167 A. 2d 129 (1961). Thus, the general rule regarding instructions to the jury has two aspects: (1) the instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury.

In the case before us, the first aspect was satisfied. It is not disputed that the mitigation instruction requested by

Sergeant was a correct exposition of the law. In its 18 November 1978 opinion, the Court of Special Appeals observed: "In the abstract, [Sergeant's] statement of the law that the non-breaching party has a duty to mitigate, cannot be fairly faulted." We must determine, therefore, whether the second aspect was satisfied.[2] Here, the written prayer was filed by Sergeant at the close of the evidence, Rule 554 a, and the determination must be made on the basis of what evidence was before the jury at that time. We recount the evidence adduced at trial, borrowing freely from the opinion of the Court of Special Appeals of 27 December 1977.

The Sergeant Company (the Company), was a wholly owned subsidiary of Waldorf. Pickett had planned to construct some sixty houses in a development in Charles County to be known as "Cliffton on the Potomac". By an "Agreement of Special Agency" it was provided that the Company would have the exclusive authority to obtain a permanent mortgage loan commitment not to exceed $2,400,000 for the use of prospective purchasers of the homes Pickett was to build. The agreement contemplated that "special forward"[3] money would be obtained by the Company's best efforts, within the commitment limits, if such funds became available.

The Company was to be compensated for its services by payment of $12,000 cash at the time the commitment was obtained and execution of three notes totaling $12,719.95 in periodic deferred payments. A general commitment was obtained from Waldorf on January 16, 1975.

On January 24, 1975, about a week after the original agreement was executed and the commitment arranged, although the Company had not received the fee pursuant to the agreement, it advised Pickett that Waldorf had obtained some "special forward" money at 7¾ percent, but that Pickett could only obtain $485,000 worth. In order to obtain

---

2. In refusing to give the mitigation instruction, the trial judge said: "I don't think it is applicable. . . ."

3. Apparently, "special forward" money is that made available from programs implemented by Government National Mortgage Association, Federal National Mortgage Association or Federal Home Loan Mortgage Corporation.

the money Waldorf would need one percent "up front". Pickett thereupon mailed a check to the Company for $4,850 to be forwarded to Waldorf.

According to Pickett the original fee to the Company as provided by the agreement had not been paid because there was trouble in getting building permits from the county. Pickett explained this to the Company in response to its inquiry about its fee, and, about 20 March 1975, after negotiations, the Company agreed to await its fee either until Pickett obtained a "construction loan with a take-out," [4] or until the time of settlement of the houses to be constructed, whichever first occurred. As a "sign of good faith," the Company demanded and received $2,000 for the concession, but, according to Pickett, suggested that he "call it for processing the first 20 applications down there at $100.00 a piece but it was like a kicker really of $2,000.00."

Nothing of consequence occurred then until late in July when Pickett's permit problem was finally resolved by the grant of 50 permits by the county with more permits to follow. At that time, according to Pickett, a separate agreement in the nature of a novation of the original agreement between him and the Company occurred. He explained that he called C. Douglas Sergeant, Jr., President of the Company, and told him that the matter of the building permits had been resolved. Pickett and Mr. Sergeant met on 18 August and talked about the whole situation. Pickett explained that it would be more reasonable for him to build about 30 houses rather than 60:

> I had builders who now wanted lots and they were willing to buy the lots and pay cash for them. I was in a cash flow bind, because of the delay for the six or seven months and so I leveled with him, I said I can sell lots to builders, get some cash in if you will reduce your commitment down to say 30 houses or so, let me use the $485,000.00, have Waldorf give me some more money for the rest of the 30 houses,

---

4. Pickett explained that a construction loan with a take-out was a "construction loan where I could draw monies down immediately to buy the lots in and then have some extra monies to pay him at that time. . . ."

reduce from 2 million, four, down to around a million dollars, that that would be a good way for me to go.

Mr. Sergeant told Pickett to "get your contracts together, tell me exactly how many houses you are going to build, give me the time schedule so I can go back to Waldorf and lay it out to Waldorf exactly what we are going to do right now because there has been some confusion over the last six months and I will do one new agreement with one set of fees and one final commitment with you for 30 houses or however many you want and that will be the program that we will go with."

Pickett had entered into 13 contracts with prospective buyers and met with Mr. Sergeant at the Company's office on 9 September 1975. Pickett's version of what followed was that when he showed Mr. Sergeant the 13 applications for loans from Waldorf by his contract buyers, Mr. Sergeant said:

> Hey, hey, ha ha, I got a big surprise for you. . . . I sold your commitment to somebody else. 485,000, Waldorf has given it away to somebody else, a builder.

Since the Company had extended Pickett's notes, or at least made no demand on them as they came due, and the relationship had always been good, he thought Mr. Sergeant was joking. Pickett suggested they discuss the matter over lunch.

> So, for an hour and a half we sat in the restaurant, I picked up the check, and he talked to me about how he sold this commitment, honest and really, and in earnest, he had really sold the money, too, that I had paid him for to some other builder and this wasn't, Waldorf didn't have any money for me, that was it.

\* \* \*

> From day one he said look, I have sold the commitment, Waldorf doesn't have this $485,000.00 of 7¾ money, there is nothing we can do.

They returned to the Company's office and sat in Pickett's car for another half hour or so discussing the matter. Mr.

Sergeant declared that he "was not even going to take [Pickett's] applications," but then said:

> I will change my position on that. I will change my position but I am going to tell you right now, it will take months to process these applications, and I doubt seriously if any of your purchasers are going to be qualified for Waldorf to lend them money.

Pickett testified that he said:

> Okay, Doug, give me my money back that I have paid you and we will just walk away and never speak to one another again, and that will be the end of that.
>
> I already told him I was going to sue him and Waldorf and the whole bunch up there for what they did to me because they shouldn't be in business operating that way.

When Pickett learned that loans would not be available from Waldorf for his buyers, he was obliged to change his "entire operation ... toward unloading lots to builders and bailing out and saving what I could, because I was going down the tube because of this operation. I saved what I could on that development." He was able to obtain financing for his buyers at a higher rate of interest than that which Waldorf had agreed upon. He then

> took all of the contracts that I had and I met with the individual people and I rewrote them and I agreed to pay all of their closing costs and all of their fees and all of their points and everything it cost, in other words, it wouldn't cost them anything or down payment, a five percent down payment to move in the house and I salvaged four of those 13 contracts. ... But the people had to agree to pay, it was like 9½ percent interest, which was the going rate then for the loans, but paying the 9½ instead of 7¾.
>
> I paid all of their closing costs and everything. So I did build those four houses from the original deal

and I reserved some other lots, another ten lots or
so so I could build a few more houses.

The closing costs which he paid averaged $1,200 a house, so
he lost $4,800 of the profit he would have realized on the
houses he was able to build had the permanent financing
interest rate been 7¾% as agreed by Waldorf. He also lost
$130,000, representing a profit in the amount of $5,000 a
house, he would have made on the 26 houses he was unable
to build and sell because of the withdrawal of the Waldorf
commitment: "I add $5,000 into my houses when I build
them." A further loss was the $4,850 and $2,000 he had paid
the Company in relation to the Waldorf commitment.
Furthermore, because he had other notes he "had to meet and
what not," he "had to get some cash" to establish "cash
flow." He "went immediately to a builder who was kind of
standing in the reaches, waiting for me to . . . be in a little
trouble." He sold lots for $7,000 apiece to get the cash he had
to have. $7,000 was "an extremely good price [from the
buyer's standpoint] for a lot with water and sewer in Charles
County." He made no profit on the sales of those lots.

The Company's version concerning the withdrawal of
Waldorf's commitment differed in material aspects from
Pickett's version. The Company's version was shown by a
three page letter dated 18 September 1975 [5] to Pickett from
the Company over the signature of its president who felt that
it was "time to review the events relative to our association
and bring this matter to a close." The letter was offered in
evidence by Pickett. It was written

> [j]ust so there will be no further misunderstanding
> between us in the matter of your outstanding
> commitment, verbal agreements or disagreements
> and the agency agreement. . . .

The Company acknowledged the Agreement of Special
Agency of 14 January 1975, the obtaining of a commitment
in the amount of $2,400,000, its acceptance by Pickett on 17

---

5. The second and third pages of the letter bear the date 11 September
1975.

January and the execution of the confessed judgment notes pursuant to the Agreement. The Company alleged that the cash due it under the Agreement had not been paid by Pickett, but verbal assurances of payment were made. The Company admitted that it had informed Pickett on 22 January of the availability of 7¾% GNMA money and asserted that Pickett had authorized it to obtain $485,000 of this money in his behalf. The Company thereupon forwarded $4,850 of the Company's funds to its correspondent, Waldorf, to GNMA. The Company was not reimbursed by Pickett for the $4,850 until 28 January, with further promise of the fees then still unpaid. A letter dated 24 February from the Company to Pickett regarding the unpaid fees remained unanswered. The Company and Pickett discussed the possibility of obtaining a Waldorf commitment for construction for the payment of a separate underwriting fee in the amount of $2,000. On 24 March 1975 Pickett wrote the Company enclosing a check for $2,000 designated "processing fees" to qualify home purchasers, although it in fact was an underwriting fee for obtaining a construction loan through the Company. The Company letter explained:

> I did not cash the check and wrote you a letter on March 26, 1975 stating what the fee was for and clarifying our understanding. You did not reply to my letter of March 26, 1975 nor did you clarify the purpose of the $2,000.00 check. I still did not cash it, because I never received any further advice from you.

The following months revealed nothing except that Pickett could not obtain the necessary building permits and became involved in a suit against the county. He made no attempt to pay the fees the Company claimed were owed it and the confessed judgment notes became due without payment. The Company analyzed the situation thus:

> In other words, if you won the suit for obtaining permits you would hold us to the commitment, but if you lost, you could always refuse to pay us for the fees and not live up to your obligation.

We set out verbatim paragraphs 10 and 11 of the Company's letter:

10. On August 18, 1975 I met with you on your yacht in Baltimore Harbor which was being utilized by your new partner, John Hubble, as his campaign headquarters. At this time I offered to settle this matter with you by collecting four (4) points on the $485,000.00, plus interest on the notes (about $2,000.00), and in return Waldorf would commit under the 7¾% rate to the extent of $485,000.00 although a formal commitment was never drafted (since you never paid any of the money owed) the outstanding confessed judgment notes would be cancelled; and the $2,400,000.00 commitment would be cancelled. I asked you for a check and had the papers with me to calculate the exact amount. You did not have a check with you. Did you have the funds? Yes, you did, was the assurance but you had worked out a line of credit with Maryland National and this would be the best way to pay the fee which was to be in a few days and paid through a new corporate account.

11. As usual no money was forthcoming and you made an appointment to meet with me on September 9, 1975. At this meeting, I informed you that I had sold or was about to sell or had promised to sell the $485,000.00. As you can see from the foregoing, a credibility gap was growing from my point of view as to your intentions of payment. We made it clear all along that no work would be done by this office until we saw some cash money. The sale of your commitment to another developer was to shake you up — to move you off dead center and to uncover your intentions. I did not say that Waldorf would not honor their commitment to you. Nevertheless you indicated that you would bring suit for the $4,850.00 plus damages for the loss of profits to be realized from the sale of five (5) houses. The profits from the houses were anticipated at $5,000.00 for purposes of

your threatened suit, but only about $2,500.00 when you were complaining about no room in the profits to pay the fees.

Several other counter offers were made — $9,000.00 fee for $175,000.00 at 7¾% to clean up your sales and we would remarket the balance of the 7¾% to another source, or about $16,000.00 for the entire $485,000.00 at 7¾%. You rejected both of these proposals. A final proposal was partially reduced to writing with the understanding that you would pay only $7,250.00 by Friday to secure this financing and redraft our original agreement. In other words I have bent over backwards to work with you and compromise our own position in order to avoid a calling of your notes and accounts receivable. I did not want a law suit but you have been impossible to negotiate with and bearing all of this in mind I am now telling you our course of action.

(A) All previous offers to settle this matter are hereby rescinded, revoked and cancelled.

(B) We have already applied the $4,850.00 previously paid by you against our account receivable.

(C) We are now cashing your check dated March 25, 1975 in the amount of $2,000.00 which will also be applied against our account receivable.

(D) We have a balance due us (assuming your $2,000.00 check is honored) in the amount of $23,399.98 which is now due and payable in full. If this amount is not paid by certified check by the close of business on Wednesday September 28, 1975 the entire matter will be turned over to our attorney for collection.

(E) We have conferred with Waldorf Federal regarding their commitment to you and they assure us that they stand ready to honor this commitment and have been in this position since the date of issuance.

Mr. Sergeant testified that Pickett had never applied "for any loans under the $485,000.00 money or the permanent mortgage money," or for any loans through Waldorf. He was asked what would have happened had Pickett come to the Company "after September 9 and asked for 7¾ money?" He replied flatly: "He would have received it." Mr. Sergeant asserted that he was always ready after 9 September to process any application Pickett brought to him, but Pickett never brought any. No correspondence "at all" was received from Pickett after 9 September. The senior vice president and treasurer of Waldorf testified that Pickett had never utilized the commitment made by Waldorf nor had he applied to use it. He declared that if Pickett had applied for any money during the time the commitment was in effect, the money would have been granted to him if the application met the guidelines established by the federal government.

As we have indicated, Sergeant's requested instruction No. 10 —

> Where one party to a contract commits a breach of contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss he sustains as a result of the breach, and he can charge the party in default with such damages only as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.

— correctly reflected the law. "[T]he burden of proving that losses could have been avoided by reasonable effort and expense is upon the party who broke the contract." *M & R Builders v. Michael, supra,* 215 Md. at 356. Thus, if the jury found that Sergeant had breached a contract with Pickett regarding the mortgage loans, Sergeant would have the burden of proving, if it questioned the losses claimed, that Pickett had not complied with the "avoidable consequences" rule of damages. "The burden of proof, *i.e.,* the risk of nonpersuasion, never shifts from the party on whom it is placed. . . . But it should be observed that the burden of proof

is satisfied by the actual proof of the facts which need to be proved, *regardless of which party introduces the evidence.*" *Parish v. Milk Producers Ass'n,* 261 Md. 618, 691-692, 277 A. 2d 19, *cert. denied,* 404 U. S. 940 (1971) (emphasis in original). The facts which needed to be proved with regard to mitigation of Pickett's losses were that he could have avoided the losses claimed or a part of them by reasonable effort and expense without risk of additional loss or injury.

It is manifest that the actions which Pickett testified he took in building four houses minimized the losses he claimed resulted from the breach of the loan commitment. Sergeant did not refute, contradict or dispute Pickett's testimony in this respect. It is not a matter, however, of whether Pickett did what he said he did, or whether the jury had to believe his testimony concerning his salvage attempts, as Pickett urges. *But see Phelps v. Goldberg,* 270 Md. 694, 705, 313 A. 2d 683 (1974); *Johnson v. Cole,* 245 Md. 515, 522, 226 A. 2d 268 (1967); *Burleigh v. Miller,* 209 Md. 57, 68, 120 A. 2d 378 (1956). Rather, the point is that there was evidence before the jury which tended to show that Pickett had not made all reasonable efforts to minimize the loss he sustained as a result of a breach of the contract. That is, if the jury believed the evidence about the availability to Pickett of the 7¾% money for his buyers after 9 September, it would have been a reasonable endeavor for him, without risk of additional substantial loss or injury, to apply to the Company for such money and thus prevent any loss. The short of it is that on the evidence adduced, the jury could have found that Pickett had not made all reasonable efforts to minimize the losses claimed through a failure to honor the Waldorf commitment. It follows that Sergeant was entitled to an instruction on mitigation and that the trial court erred in failing to give it.

The judgment of the Court of Special Appeals affirming the judgment of the Circuit Court for Charles County is reversed. Our review by way of certiorari of the substantive issue went only to the award of damages. Therefore, we remand the case to the Court of Special Appeals with direction that it affirm the judgment of the Circuit Court for Charles County with respect to the question of the liability of appellants, that it

vacate the judgment of that court with respect to the assessment of damages, and that it order a new trial limited solely to the matter of damages.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court with direction that it affirm the judgment of the Circuit Court for Charles County with respect to the liability of appellants, that it vacate the judgment of the Circuit Court for Charles County with respect to the assessment of damages, and that it order a new trial limited to the question of damages.*
>
> *Costs to be paid one-half by appellants and one-half by appellee.*