732 A.2d 301

**Deborah M. BELIN**

v.

**Lenox DINGLE, Jr., et al.**

**No. 462, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

June 30, 1999.

Harrell, J., concurred and dissented and filed opinion.

Leslie L. Gladstone, Baltimore, for appellant.

Catherine W. Steiner (Whiteford, Taylor & Preston, LLP, on the brief), Baltimore, for appellee, Dingle.

Thomas V. Monahan, Jr. (Goodell, DeVries, Leech & Gray, LLP, on the brief), Baltimore, for appellee, Mercy Medical.

Argued before MURPHY, C.J., and DAVIS and HARRELL, JJ.

MURPHY, Chief Judge.

■ According to the Judicial Council of the American Medical Association,

> To have another physician operate on one's patient without the patient's knowledge and consent is a deceit. The patient is entitled to choose his own physician and should be permitted to acquiesce in or refuse to accept the substitution. The surgeon's obligation to the patient requires him to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of all facts relevant to the need and the performance of the operation; and (4) to utilize his best skill in performing he operation. The patient is entitled to the services of the particular surgeon with whom he or she contracts. The surgeon, in accepting the patient is obligated to utilize his personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship. He cannot properly delegate to another the duties which he is required to perform personally. Under normal and customary arrangement with private patients, and with reference to the usual form of consent to operation, the surgeon is obligated to perform the operation, and may use the services of assisting residents or other assisting surgeons to the extent that the operation reasonably requires the employment of such assistance. If a resident or other physician is to perform the operation under the guidance of the surgeon, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent.

> If the surgeon employed merely assists the resident or other physician in performing the operation, it is the resident or other physician who becomes the operating surgeon. If the patient is not informed as to the identity of the operating surgeon, the situation is "ghost surgery."

Judicial Council of the American Medical Ass'n, Op. 8.12 (1982). This appeal from the Circuit Court for Baltimore City presents us with the question of how the trier of fact should go about resolving a "ghost surgery" claim arising out of an operation that was unsuccessful because of an error that did not constitute a deviation from the applicable standard of care.[1] It comes to us from a jury determination that Dr. Lenox Dingle and Mercy Medical Center ("Mercy"), appellees, were not responsible for injuries sustained by Debra Belin, appellant, during appellant's July 21, 1993 surgery. Prior to jury deliberations, the circuit court granted appellees' Motion for Judgment on appellant's breach of contract claim.[2]

Appellant has framed the following questions for our review:

I.     Did the Trial Court err in dismissing the Breach of Contract Count (Count Four) on the grounds that it was subsumed under the Negligence Count?

II.    Did the Trial Court err in prohibiting testimony as to the character of the Appellant for truthfulness?

III.   Did the Trial Court err in refusing to instruct the jury with the Appellant's theory of the case instruction to wit:

   (a) a plaintiff need not prove the specific mechanism or act of negligence in the operating room; and

   (b) an expert may conclude from the results of the operative procedure that negligence occurred causing the injury.

For the reasons that follow, we answer "yes" to question I, and "no" to questions II and III. Appellant is entitled to a new trial on the breach of contract claim asserted against Dr. Dingle.

---

1. It is well settled that a physician who "exercises the degree of care, skill and diligence required by the law ... is not liable for a bona fide error in judgment." *Levett v. Etkind,* 158 Conn. 567, 265 A.2d 70, 74 (1969).

2. The circuit court also entered a judgment against appellant on her battery claim. This appeal does not challenge that ruling.

## Background

Appellant, a Mercy employee, was advised by her primary care physician that she may need gallbladder removal surgery. On June 29, 1993, appellant was examined by Dr. Dingle, who recommended surgery. Although there is a dispute over who said what during that meeting, appellant decided to have the operation. On July 2, 1993, appellant signed a Mercy "Consent to Diagnostic, Therapeutic and Surgical Procedure" form which provided as follows:

I hereby authorize *Dr. Dingle* and/or such assistants as may be selected or supervised by him to treat the following condition(s):_by performing the following diagnostic, therapeutic, or surgical procedure(s): *Laparascopic Cholecystectomy.*

Appellant underwent gallbladder removal surgery on July 21, 1993. The jurors heard testimony that Doctor Tracy Magnuson, a resident at Mercy, performed the surgery under the supervision of Dr. Dingle.[3]  Unfortunately for appellant,

---

**3.**  Paulette Jones, a surgical technician at Mercy, testified as follows:

[APPELLANT'S COUNSEL]: Now do you remember when you and I met in my office during your deposition? Do you remember that? [WITNESS]: Yes.

\*          \*          \*

[APPELLANT'S COUNSEL]: Do you remember me asking you at that time, and I will ask you again today, whether or not you were present at the time on July 2, 1993, when [appellant] had her gallbladder removal done? [WITNESS]: Yes, I was.

\*          \*          \*

[APPELLANT'S COUNSEL]: Question: "[Dr. Magnuson] dissected the gallbladder off the liver. So she had the cutting instruments?" Answer: "And she was, yeah, the dissector, whatever she needs." Do you recall? Does that refresh your recollection? [WITNESS]: Yes.

\*          \*          \*

[APPELLANT'S COUNSEL]: "So if [Dr. Magnuson] did the clipping of the ducts that needed clipping, and also she did the actual transection of the duct [sic]?" Your answer was: "Yes, sir." Does that refresh your recollection?

Doctor Magnuson erroneously cut and clamped the common bile duct. That error caused leakage of bile into appellant's abdomen, as a result of which appellant (1) suffered pain and bloating, (2) needed reconstructive surgery, as well as numerous post operation (bile collection) tube replacements, and (3) was required to undergo two incisional hernia operations.

## I.

### Appellant's Contract Action

Appellant testified that she was familiar with Dr. Dingle because he was a "regular surgeon" at Mercy. As appellant put it, Mercy was used as a teaching facility for residents, and she did not want her operation to be used for training pur-

---

[WITNESS]: Yes.

\* \* \*

[APPELLANT'S COUNSEL]:Then I asked you: "Tell me what you first saw and what she said"—referring to Dr. Magnuson. Answer: "She was just basically asking where do they put the clips at, where do they dissect them; you know, dissect the gallbladder off. She was just—I can't remember all the whole conversation, but you now, she was just asking different questions." Does that refresh your recollection?
[WITNESS]: Yes.
[APPELLANT'S COUNSEL]: "Did there come a time during the procedure that she wanted to stop the procedure?" Answer: "She wanted to switch sides with Dr. Dingle." Do you remember saying that at your deposition? Does that refresh your recollection?
[WITNESS]: Yes.
[APPELLANT'S COUNSEL]: Was that the truth?
[WITNESS]: Yes.
[APPELLANT'S COUNSEL]:Question: "Did she say why?" Answer: "I can't remember why, exactly why, but she did want to switch." Question: "What did Dr. Dingle say?" Answer: "He just carried on with the surgery." Does that refresh your recollection as to what was said?
[WITNESS]: Yes, sir.
[APPELLANT'S COUNSEL]: Page 12, line 10: "Did you hear [Dr.] Magnuson say during the surgery I'm having difficulty; I'm not sure—or was there a hesitancy about what she was doing that you remember?" Your answer: "She—she had a little bit of difficulty. There was a lot of fat in the stomach. I guess it was probably one of the reasons." Does that refresh your recollection?
[WITNESS]: Yes.

poses. The following transpired during appellant's direct examination:

[APPELLANT'S COUNSEL]: All right when you met with Dr. Dingle on June 29th, did you have a conversation with him about who would be performing the surgery?

[APPELLANT]: Definitely.

[APPELLANT'S COUNSEL]: All right, will you tell the members of the jury, please, what that conversation was?

[APPELLANT]: After Dr. Dingle examined me, I told him that I wanted him to be the one that was going to cut me and identify the gallbladder and take it out. And he said well, you know, [appellant], I can't do the surgery by myself. I said I'm aware of that. I said, but if you have a resident in there, I just want that person to maybe suture me up. But I want you to be the one to do my surgery. And he agreed.

[APPELLANT'S COUNSEL]: All right, when you say that you wanted him to cut you, what did you mean by that?

[APPELLANT]: I wanted him to make the initial cut.

[APPELLANT'S COUNSEL]: And what else?

[APPELLANT]: And I wanted him to identify my gallbladder and to cut the gallbladder from whatever it's connected to.

[APPELLANT'S COUNSEL]: Okay, All [sic] right. Were you aware that there was a camera used in a lap choli procedure?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Were you aware that someone needed to hold the camera?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Were you aware that someone needed to hold the retractors holding up the gallbladder?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: All right. Based on your discussion with Dr. Dingle, whom did you anticipate would do those things?

[APPELLANT]: I had no idea, and I wasn't all that concerned about who would be holding the camera. My main concern was I wanted to know who was going to be cutting me open and taking my gallbladder out.

[APPELLANT'S COUNSEL]: Were you aware that sometimes at Mercy the actual cutting and the clipping of the ducts and the gallbladder removal was done by a resident under the supervision of the surgeon?

[APPELLANT]: I am aware that sometimes the residents do it, if the doctors let them do it.

[APPELLANT'S COUNSEL]: Did you want that to happen in your case?

[APPELLANT]: Definitely not.

[APPELLANT'S COUNSEL]: So you chose the surgeon, Dr. Dingle. Did you choose anyone else in the operating room?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: As far as the anesthesiologist?

[APPELLANT]: Oh, I'm sorry, yes. I chose everybody. I chose the surgeon, Dr. Dingle. I chose the nurse, Anne Turner. I chose the anesthesiologist, Dr. Halisi. And by the way, he's in charge of that department. And I chose the surgical tech, which was Ceola.

Dr. Dingle denied that he had ever entered into any such agreement. The following transpired during his direct examination:

[COUNSEL]: . . . . Do you recall having the conversation that we've heard [appellant] describe in her testimony about what role a resident was to play in her operation?

[DR. DINGLE]: We didn't have that conversation.

[COUNSEL]: And how did you know you did not have that conversation?

[DR. DINGLE]: Well, I think, you know, we're sitting hear four and a half years later, I think at the time I took the deposition, it was three years after the fact and people say, well how do you know what was said at that point in time and the only way I can answer it is simply like this, I think if you had asked anybody in this room what they were doing on the evening of November 2nd, 1995, most would say you know, I really can't recall what I was doing that evening.

\* \* \*

But if you ask them if you were having dinner with Nelson Mandella or whether or not they were robbing a bank, I think they could say no, I wasn't doing those kind [sic] of things and the reason why they can say it is because they've never done them before. And so I cannot specifically recall specific elements of that conversation but I know I've never had anybody tell me that you cannot do this or you cannot do this and I want you to specifically do that and this in an operation. That's something that I think I would remember and it's something that I probably would object to.

[COUNSEL]: I want you to assume for the purposes of my question at the moment that [appellant] said to you what she's testified she said to you, if in fact she had said that, what about the course of her operation would have changed, if anything?

[DR. DINGLE]: Let's assume, assuming that she said that and assuming that I was going to comply with that, for the benefit of the doubt, let's just say okay, [appellant] I'm going to do as you ask me, I would have had to take her to a different hospital. To not be able to have the residents work with me would have meant that I would have had to go to another hospital and perhaps ask some surgeons from the community if they would want to be available to operation [sic] and assist. But I would have done pretty much what the other doctors here have said, that I don't want to go into the operating room with these conditions placed on me. That I need to be able to perform the surgery in the way in which I feel is best done. I may have asked her to get another surgeon.

[COUNSEL]: And did any of those things occur in this case?

[DR. DINGLE]: No.

■ The jurors did not resolve this testimonial conflict because at the close of all of the evidence, the circuit court granted appellee's motion for judgment on the breach of contract count against Dr. Dingle on the basis that it was subsumed in the negligence count.[4] We are persuaded that the circuit court should not have done so.

In *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431 (1983), the Supreme Court of New Jersey considered claims asserted by a patient-appellant who testified that he never authorized any surgeon other than the physician-appellee to perform the operation. In this case, the patient-appellant had executed a consent form that named the physician-appellee "as the operating surgeon and authorized him, with the aid of unnamed 'assistants,' to perform the surgery." 92 N.J. at 452, 457 A.2d at 434. Appellee was not present at the operation. Appellant learned the identities of the operating surgeons only after being readmitted for post-surgical complications. The supreme court held that, under these circumstances,

> As to [the physician-appellee], the action follows from the alleged breach of his agreement to operate and the fiduciary duty he owed his patient. With respect to that allegation,

---

4. Although Judge Harrell's dissenting opinion quotes accurately from the trial transcript, we are persuaded that this issue is properly before us. We here review proceedings that were recorded by audiotape rather than by a stenographer, although this case was tried in a courtroom that was not originally designed for producing transcripts from audiotapes. Our review of the audiotape makes it clear that the relevant arguments were made at a bench conference during which the audiotape did not capture everything said by counsel or by the court. Moreover, neither appellee's counsel has argued to us that the breach of contract claim was not preserved for our review. Because all parties in this case were very well represented by able, experienced and ethical counsel, it is not surprising that (1) the closing argument of appellant's counsel does not include a claim foreclosed by the court's ruling, and (2) the briefs filed by appellees' counsel do not include a "failure to preserve" argument.

the Judicial Council of the American Medical Association has decried the substitution of one surgeon for another without the consent of the patient, describing the practice as a "deceit." A patient has a right to choose the surgeon who will operate on him and to refuse to accept a substitute. Correlative to that right is the duty of the doctor to provide his or her personal services in accordance with the agreement with the patient.

Few decisions bespeak greater trust and confidence than the decision of the patient to proceed with surgery. Implicit in that decision is a willingness of the patient to put his life or her life in the hands of a known and trusted medical doctor.

\*     \*     \*

The point is that the patient has the right to know who will operate and the consent form should reflect the patient's decision. Where a competent patient consents to surgery by a specific surgeon of his choice, the patient has every right to expect that surgeon, not another, to operate.

The failure of a surgeon to perform a medical procedure after soliciting a patient's consent, like the failure to operate on the appropriate part of the patient's body, is a deviation from standard medical care. It is malpractice whether the right surgeon operates on the wrong part or the wrong surgeon operates on the right part of the patient. In each instance, the surgeon has breached his duty to care for he patient. Where damages are the proximate result of a deviation from standard medical care, a patient has a cause of action for malpractice. Although an alternative cause of action could be framed as a breach of contract between the surgeon and the patient, generally the more appropriate characterization of the cause will be for breach of the duty of care owed by the doctor to the patient. The absence of damages may render any action deficient, but the doctor who, without the consent of the patient, permits another

surgeon to operate violates not only a fundamental tenet of the medical profession, but also a legal obligation.

92 N.J. at 463–465, 457 A.2d at 440–441. If it is true that (1) Dr. Dingle had agreed to appellant's version of their contract and (2) did not do what he had agreed to do, Dr. Dingle's contractual obligation was separate from and existed independent of his duty to make sure that no deviation from the applicable standard of care occurred during the operation.[5]

It is clear that (1) the patient-plaintiff has the burden of persuasion on the issue of whether the physician-defendant breached the agreement to perform the surgery *personally,* and (2) the physician-defendant should not be held liable for injuries that the patient-plaintiff would have suffered even if there had been no breach of the agreement. We must therefore decide which party has the burden of persuasion on the issue of damages. If, on remand, a jury is persuaded that Dr. Dingle did breach the agreement, is appellant also required to persuade the jurors that she would not have suffered the unintended consequences of the operation if it had been performed by Dr. Dingle, or is Dr. Dingle required to persuade the jurors that the result would have been the same even if he had done everything that he had agreed to do?

We are persuaded that in a "ghost surgery" claim, once the jurors find that (1) the physician-defendant did

---

**5.** A determination of exactly what the parties agreed to requires a demeanor-based credibility assessment. Moreover, the precise terms of an agreement to perform surgery may be of dispositive consequence. In *Monturi v. Englewood Hospital,* 246 N.J.Super. 547, 588 A.2d 408 (1991), the Superior Court of New Jersey distinguished *Perna* on the ground that the surgeon in *Monturi* permitted a resident to make the initial incision, before performing the rest of the surgical procedure. Noting that in *Perna,* "the only authorized operating surgeon had substituted another unauthorized operating surgeon. No question of an assisting physician was involved," the court reasoned that since the chosen surgeon performed the operation, "plaintiff had to demonstrate by competent medical opinion that making the first incision converted [defendant] into the unauthorized operating surgeon." *Id.* at 553, 588 A.2d 408. Our conclusion that a remand is required should not be taken as an indication that we have made a credibility assessment of the conflicting evidence.

breach the agreement to perform the surgery, and (2) the surgery was unsuccessful,[6]

I. the patient has the burden of persuasion on the issue of what damages resulted from the unintended consequences of the operation, i.e. those injuries that would not have followed from a successful operation; and

II. the physician has the burden of persuasion on the issue of what injuries would have followed the unsuccessful operation even if the physician had not breached the agreement.

Thus, on remand, the jurors will be instructed that if the "agreement to perform" issue is resolved in appellant's favor, appellant is entitled to damages for (1) all injuries that the jurors find more likely so than not so resulted from the cutting of her common bile duct, (2) except for those particular injuries that the jurors find more likely so than not so would have been sustained even if Dr. Dingle had performed as agreed. Such a damage award is consistent with the well settled rule that the party who has breached the contract bears the burden of persuasion on the mitigation of damages issue. *Volos, Ltd. v. Sotera*, 264 Md. 155, 176, 286 A.2d 101 (1972); *Sergeant Co. v. Pickett*, 285 Md. 186, 203, 401 A.2d 651 (1979); *Mattvidi v. NationsBank*, 100 Md.App. 71, 90, 639 A.2d 228 (1994).

### Appellant's Negligence Actions

We are persuaded that the circuit court did not commit any error with respect to appellant's negligence claims against either appellee. The evidence was sufficient to support the jurors' conclusion that neither appellee was negligent.

---

6. If a "ghost" surgery is successful, i.e. does not result in any unintended consequences, the patient would be entitled to either nominal damages or, where applicable, "damages for mental anguish resulting from the belated knowledge that the operation was performed by a doctor to whom the patient had not given consent." *Monturi v. Englewood Hospital*, 246 N.J.Super. 547, 552, 588 A.2d 408, 411 (1991).

## II.

There is no merit in appellant's contention that the circuit court erred in disallowing testimony as to appellant's truthfulness. The following transpired during the direct examination of appellant's aunt:

[APPELLANT'S COUNSEL]: I will just ask you this. You may seem to think that this is kind of a funny question. Does your niece have a reputation in the community about being a truthful person?

[COUNSEL FOR MERCY]: Objection.

[COUNSEL FOR DINGLE]: Objection.

[THE COURT]: Sustained.

[APPELLANT'S COUNSEL]: You Honor, may I approach?

[THE COURT]: Sure.

(Counsel approached the bench and the following ensued:)

[APPELLANT'S COUNSEL]: Dr. Dingle is going to say that he has no recollection of this conversation. In fact, because of the unusual nature of the conversation about not wanting the resident to do the cutting and clipping, the doctor mentioned he would have remembered it. So I believe that there is clearly going to be in this case a question if credibility, and that is the reason that I have asked that question. I believe it is appropriate to bring in character testimony of [sic] credibility as an issue, and that is why I have asked that question. So although my client's credibility has not yet been attacked, I anticipate that being the case with the testimony of Dr. Dingle pursuant to his deposition.

We agree with the circuit court that such "good character" evidence was inadmissible under Md. Rule 5–608(a)(2). It is well settled that in the trial of a civil action,

[c]ontradictory testimony of different witnesses may proceed from want of equal knowledge or observation not involving the moral character of either; but such conflict

does not authorize the admission of evidence as to the general character of the witness for truth.

*Vernon v. Tucker,* 30 Md. 456, 462 (1869). Appellant was not entitled to present evidence of her good character for veracity in "anticipatory rehabilitation" of Dr. Dingle's contradictory testimony.

## III.

Appellant argues that the circuit court erred in refusing to instruct the jury that the appellant was not required to prove the specific act of negligence in the operating room. Appellees argue that such an instruction is inapplicable to this case because appellant's expert opined as to the precise act of negligence that allegedly caused appellant's injury. When a specific act of negligence has been asserted, the jury is required

> to decide whether it accepted as credible the expert's testimony concerning why negligence must have been the cause of [the] accident.

*Dover Elevator Co. v. Swann,* 334 Md. 231, 249, 638 A.2d 762 (1994). We are persuaded that, because appellant's expert identified "the actual mechanism of the [appellant's] injury," the circuit court correctly rejected appellant's requested instruction.

Appellant next argues that the trial judge committed error in refusing to instruct the jury that an expert witness may conclude from the result of the procedure that appellees were negligent.

> If any form of a "mere happening" instruction is to be given in a medical malpractice case requiring expert testimony, the jury should be informed that, although an unsuccessful result does not create a presumption of negligence, it still may be considered as some evidence of negligence and that an expert witness may consider it in formulating his or her opinion that there was negligence.

*Kennelly v. Burgess,* 337 Md. 562, 575, 654 A.2d 1335 (1995). In this case, however, the jurors did not receive a "mere

happening" instruction. Moreover, both appellant's expert and Dr. Dingle's expert agreed that an erroneous clamping of the common bile duct can occur in the absence of negligence.[7] Under these circumstances the circuit court did not err in refusing to instruct the jury that an expert could infer the existence of negligence from the outcome of the surgery.

**JUDGMENTS ON THE MALPRACTICE CLAIMS AFFIRMED; JUDGMENT ON THE CONTRACT CLAIM AGAINST APPELLEE DINGLE VACATED; CONTRACT CLAIM REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. APPELLANT TO PAY 75% OF THE COSTS; 25% OF THE COSTS TO BE PAID BY APPELLEE DINGLE.**

HARRELL, Judge, concurring and dissenting:

Although I agree with the majority's view that the judgments as to the negligence-based claims should be affirmed, I respectfully dissent from that portion of the majority opinion that vacates the judgment regarding the breach of contract claim. My reasoning in this regard does not exclude uniformly the potential for a viable breach of contract claim under the same or similar circumstances, only that the available record in this case, in my view, does not support the majority's outcome.

At the close of all of the evidence, appellee Dingle renewed his motion for judgment as to appellant's breach of contract claim. The thrust of the motion was that the alleged breach

---

**7.** Appellant's expert testified on cross examination as follows:

    [COUNSEL FOR DINGLE]: Would you agree with me that a common bile duct injury can occur in the absolute absence of negligence?
    [WITNESS]: Absolutely.

  Doctor Dingle's expert testified on direct examination as follows:

    [COUNSEL FOR DINGLE]: Doctor, do you have an opinion to a reasonable degree of medical probability as to whether that mistake can occur and did in this case occur, even though the doctors acted without negligence? Can it occur without negligence?
    [WITNESS]: Oh, yes, I injured a common duct in a patient that had a short cystic duct.... And it's, when you run into this the average surgeon in the world would tend to make this same error.

of contract count was subsumed in the counts styled as lack of informed consent and negligence in the performance of the surgical procedure. According to the trial transcript, Dr. Dingle's counsel argued in support that:

> [I]t is a breach of contract arising out of a professional relationship, and therefore, negligent [sic] or malpractice case, and that is all she has here. If anything, it is a malpractice case because the injuries growing [therefrom] would be the same. She does not have any special damages because of the alleged breach of contract. There is no indication that there was anything special that happened to her or didn't happen or otherwise simply because a resident [physician] did the part of the procedure that she alleges she did not want the resident to do. And therefore, it is simply at its foundation, a negligence case. The breach of contract should be dismissed.

In direct response to this motion and argument, appellant stated:

> As I indicated to the court—[ ] as long as it's made clear to the jury that this contractual issue is part of the cause—and or the negligence—then fine, I have no problem with you granting the motion for dismissal. So, my only concern is that all the issues of this case—what form it takes, I don't really care. So, as long as that can be considered by the jury as part of negligence by—then, that's fine with me. One of my concerns is—but, if Your Honor feels this is a close call, as long as my issues can be presented to the jury in one form or another, I have no problem granting the motion, although—and, as long as all issues are before the jury.

Based on these arguments, the court granted appellee Dingle's motion for judgment. After the court instructed the jury regarding the negligence counts, appellant did not except to any of the instructions as given on the basis that any instruction limited her closing arguments as to liability or damages in a way that conflicted with her response to the motion for judgment on the contract claim. Moreover, appellant took no

exception to any instruction requested, but not given, related to this point.

My review of the joint record extract provided to us by the parties regarding appellant's closing argument, both initially and on rebuttal, reveals no objection by appellees (and therefore no additional limitation imposed by the court) or any expression by appellant that she was inhibited or limited in her arguments in a way inconsistent with her articulated position on the motion for judgment. To the contrary, she integrated in her remarks at numerous places allusions to the alleged agreement that only Dr. Dingle would perform the surgery on her. For example, during her initial closing, she stated variously:

> There are two separate aspects to this case. Lack of informed consent, the Judge has told you, the consent to have someone else other than Dr. Dingle be in the position of the operating surgeon.

> \* \* \* \* \* \*

> Dr. Dingle was being paid $2,800 to perform that surgery, and she [appellant] wanted him to be the operating surgeon. The lack of informed consent issue does apply as to Dr. Dingle because he is the one who was required to get the informed consent.

> \* \* \* \* \* \*

> Dr. Dingle, however, is accountable for that. There was an agreement, an expressed agreement as to who would be the operating surgeon.

> \* \* \* \* \* \*

> To find in favor of the doctors and the hospital, you have to find that my client, Debra Belin, is lying regarding her request made to Dr. Dingle . . .

In rebuttal argument, appellant's counsel continued, for example, by saying:

My client wanted the person who she thought knew how to do a laparoscopic cholecystectomy to do the cutting and clipping.

\* \* \* \* \* \*

But if you had your druthers, whose hand would you rather have on that sharp instrument? Someone who you are paying to do the job? That is why I mentioned the money because $2,800 is something you are paying for a heck of a lot of expertise to be on that fine cutting and the clipping, to make those fine determinations ...

Like my colleagues, I attempted to listen to the audio of the videotape of the pertinent portions of the trial proceedings. Although snippets of phrases were identifiable (and those were consistent with the portions of the transcript reproduced in this dissent), static was the predominant aural message conveyed on the tape. Had appellant wished to supplement or correct the record, she obviously knew how to do so as she had moved us successfully to accomplish that objective previously with regard to an unrelated shortcoming of another part of the record.[1] While I have no reason to doubt the majority opinion's description of counsel as able, experienced and ethical, I am unable, as an article of appellate faith, to declare that something else is present that is not demonstrably there.

Based on the state of this record, as presented in the joint record extract, I cannot but conclude that appellant failed to

---

1. In a Motion For Correction of Record, filed on 22 October 1998, appellant asked that we accept the following stipulation of counsel in supplementation of an inadequate "corrected transcript" of the trial proceedings of 8 December 1997:

    [The trial judge] dismissed the Plaintiff's contract count at the close of all of the evidence on the grounds that it was subsumed under the negligent count. It was also stipulated that the Plaintiff's counsel excepted to the Court not instructing the jury as requested by the Plaintiff in Plaintiff's Instruction No. 11 [regarding expert opinion testimony], that the Plaintiff need not prove the specific mechanism or act of negligence that occurred in the operating room and that an expert may conclude from the results of the operation that negligence occurred causing injury.

    We granted the motion. No other such motion, proposing to correct the portions of the record addressed in this dissent, is to be found.

preserve for appellate review (*see, e.g., Osztreicher v. Juanteguy,* 338 Md. 528, 534, 659 A.2d 1278 (1995)) the argument with which the majority finds favor and upon which rock it constructs its opinion vacating the judgment as to the breach of contract claim. I would affirm the judgments.